HERSEY, Judge,
dissenting.
Because I see the facts and some aspects of the applicable law in a slightly different *952 light than the majority in this reasonably dose case, I must respectfully dissent.
The major issue is whether the baby girl E.A.W. was available for adoption. That, in turn, depends upon whether the father abandoned the expectant mother and thus the child. The statute, section 63.032(14), Florida Statutes (1993), provides as follows:
(14) “Abandoned” means a situation in which the parent or legal custodian of a child, while being able, makes no provision for the child’s support and makes no effort to communicate with the child, which situation is sufficient to evince a willful rejection of parental obligations. If, in the opinion of the court, the efforts of such parent or legal custodian to support and communicate with the child are only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned. In making this decision, the court may consider the conduct of a father towards the child’s mother during her pregnancy.
(Emphasis supplied.)
The question, then, is whether the evidence clearly and convincingly supports a finding that the father’s conduct constituted only a marginal effort that does not evince a settled purpose to assume all parental duties. It is interesting that the legislature has now specifically provided that the court may consider the conduct of a father towards the child’s mother during pregnancy. As the supreme court once held, “[w]here the legislature’s intention is clearly discernible, the court’s duty is to declare it as it finds it, and it may not modify it or shade it, out of any consideration of policy or regard for untoward consequences.” McDonald v. Roland, 65 So.2d 12, 14 (Fla.1953). Contrary to the suggestion of the majority that no textual foundation exists in the statute, use of the word “conduct” suggests to me that more than financial support is intended. The term is broad enough to, and certainly should, extend to physical assistance in attending to prenatal needs of the mother (such as doctor’s appointments) and even to emotional support of the mother which may well affect the well-being of the fetus and its appropriate development.
Turning, then, to the factual issues, it is trae that the father permitted the mother to live in his household for a period of time. I do not believe that the exact percentage of the mother’s expenses that were incidentally paid by this arrangement is nearly as important as the lawyers at trial and the majority opinion seem to think. If it were crucial, however, then it should be pointed out that: while she was pregnant but before her accident she was a waitress and contributed her earnings to household expenses; during December the father did not work at all and apparently she supported the household; for a short period of time the father’s brother lived in the household thus increasing expenses; and, the mother eventually contributed $200 of her $241 welfare check, plus $200 of her $203 food stamp money to the household. She was not self-supporting but contributed what she had. Two observations follow from that. These parties cohabited for several months before she became pregnant. His contributions to her support had little or nothing to do with assuming parental duties nor do they evidence an intention to do so. On the other hand, continuing the live-in financial arrangement or failing to terminate it upon learning of the pregnancy may be said to be some evidence that the father did not intend to abandon the mother and child. A second observation: the mother moved out on June 3rd. After that date the father apparently continued to bring home $360 to $400 per week to support a household of one. He was hardly destitute. The evidence shows that except for a two-week period the father always knew where the mother was. Yet he never paid or offered to pay one penny toward the support of the expectant mother after that date. He never took her or offered to take her to a doctor’s appointment or anywhere else. He, in fact, refused to pay anything toward the costs of childbirth. He never once inquired about her health or the well-being of his child.
The natural father, unable to show any substantial and continuing financial or physical or emotional support to the expectant mother and fetus, or later, the child, points to *953 three incidents as evidence of his dedication to parenthood. Far from showing a settled purpose to assume all parental duties, these demonstrably inaccurate assertions simply lend further support to what has become the dominant theme of this case. The natural father has made only temporary and minimal and happenstance contributions to the expectant mother. After she moved out, even that ceased. The only evidence of an intention to be a parent to this child was the naked assertion of the legal right. That cannot be enough in the eyes of the law, in light of statutory requirements and judicial precedent.
The examples offered by the father of his attempts to fulfill his role as an expectant parent are that he bought the mother a pair of stretch pants and a baby crib and accompanied her to have a sonogram. There is testimony and therefore the trial court could have found that the father did not buy either the stretch pants or the crib. The fact that there is a picture of a crib in evidence says nothing about who bought it. The testimony shows that he did not.
The father claims to have attended two sonogram sessions. The mother testifies he attended only one, and only because she insisted and picked him up and drove him to the session. If that speaks to the issue of a settled intention, it is no more than a whisper.
Turning, next, to the mother’s “voluntary” act of moving out of the household on June 3, 1992: how is that to be explained and what effect does it have on the father’s support obligation (a father’s obligation to support his child)? The testimony shows that the father indulged in alcoholic beverages to excess; that he would become abusive and belligerent; that he would scream filthy names at her and very often would order her out of the house. For a time she clung to her fantasy of marriage and a “Brady bunch type of family.” His constant verbal abuse eroded that dream little by little.
The mother was malnourished and distraught, according to testimony in the record. Ultimately she was unable to bear the strain and moved out. She was terrified of him and tried to avoid him, but he sought her out. Thus he knew where she was at all times, but contacted her only to aggravate, never to help.
On the relevant evidence presented, the trial court could have found that the conduct of this father toward this expectant mother does not evince a settled purpose to assume all parental duties, nor indeed any “parental” duties.
This raises the question, given the clear and convincing evidence standard, how the trial court could find no abandonment and later, on similar relevant evidence, find just the opposite. One can only speculate since we are not privy to the thought processes of the judge. A possible explanation is that in the first hearing the focus was on the intention or purpose of the father as evidenced by what he said. He wanted his daughter. He said so. While some of his statements may have been equivocal, on balance it could be said, measured by his stated intention, that there was no intent to abandon his unborn child. During and after the second hearing the trial court may have focused on what the father did:' that is, his conduct towards the child’s mother during her pregnancy. Weighed on that scale the court could have found, regardless of the father’s later stated intention to keep his daughter, that his actions toward the expectant mother, and as well his non-action, constituted clear and convincing evidence of abandonment.
The majority opinion analyzes the trial court’s order on rehearing and characterizes the result as resting upon three premises, each of which is then found to be legally insufficient. Without quibbling as to whether there are or are not only three discrete aspects of the trial court’s reasoning, I disagree with the majority’s position on each of the three mentioned.
Before coming to grips with those areas of major disagreement, I would preliminarily note a minor one. The opinion makes reference to the father’s reaction to learning of the mother’s pregnancy and suggests that “the mother even admitted that he was happy when she told him that she was pregnant.” As I read the record the mother did not recall the father having any reaction to *954 this news. He may have smiled. I do not understand this as evidence of an admission by the mother that the father was happy about her pregnancy.
The first basis for the trial court’s determination of abandonment is said to be the trial court’s acceptance of the contention of the adoptive parents and the attorney ad litem that the father failed to pay or offer to pay any of the prenatal medical expenses. By so limiting the issue, it is then a simple matter to conclude that because he could not afford to pay for such services this is not a legally sufficient reason to support a finding of abandonment. I believe the majority opinion restricts the trial court’s intention too narrowly. The trial court’s view encompassed all aspects of support, not simply prenatal medical care. The father lives alone, has no dependents and brings home $350 to $400 per week. At no time after June 3rd did the father pay or offer to pay one penny toward the support of the expectant mother. Not one item did he purchase for her or the child. If this is not a legally significant factor to be taken into account by the fact-finder, then it is difficult to imagine what would be. Granted the suggested conclusion, standing alone, might not be sufficient; it seems to me that it is clearly legally significant.
The majority opinion indicates that the second basis for the result reached by the trial court is the failure of the father to provide emotional support to the expectant mother. In my view this assertion too narrowly construes the sense of the language of the order before us. As indicated earlier, the trial court is empowered by statute to consider the “conduct” of the father toward the mother. While it is clear this expectant mother suffered emotional starvation at the hands of this father, there was much more to his conduct than emotional deprivation. It is true that the order stresses the emotional aspect, but the trial court also found that, according to the natural mother’s testimony,
“there was physical abuse, that he had grabbed her, shook her and had spit at her because she had the audacity to use his razor. The natural mother’s testimony was specific that [the natural father] not only did not supply her with any emotional comfort during this time, but, to the contrary, engaged in name calling and other types of verbal abuse. For example, he told her that she was “worthless” and that every other week she would be threatened with being kicked out of the apartment. The natural mother testified that she was continually fearful of the natural father. Additionally, the natural mother testified that the natural father had a drinking problem which went on continuously during the time the parties spent together.
The natural mother moved out of the natural father’s apartment in June of 1992. Sometime prior to this time, the natural mother testified that she had told the natural father she was considering adoption and the natural father’s response was “do whatever you have to do.”
The natural mother accepted this statement from the natural father as his verbal agreement with her adoption intention. As a result of that, the natural mother continued to follow through with the adoption process. The testimony was specific that at no time from February of 1992 until literally days before the birth of the child, did the natural father in any way either act directly, or by inference, to show any objection to the potential adoption of the unborn child.
Additionally, the testimony of the natural mother revealed that the natural father attended only one visit with any health care provider during the entire course of the pregnancy. While he was there, he was “an ice cube” and showed no emotion of any kind either toward the unborn child or the natural mother herself.”
The majority opinion suggests, as indicated earlier, that emotional support or lack of it is not an appropriate element of “conduct” to be considered by the trial court in these situations. I am inclined to disagree. When the legislature used the word conduct in the statute I believe that it was intended to include any act or omission, whether financial, physical or emotional, that impacts upon the well-being of the expectant mother and thus ultimately upon the fetus itself. In my view these factors should all be considered in determining whether “the efforts of such par *955 ent ... are only marginal efforts that do not evince a settled purpose to assume all parental duties.... ”
Where parties are in the process of obtaining a divorce during the pregnancy, or where other variations on the preferred theme of a harmonious relationship between father and expectant mother exist, the trial court will need to consider the effect of such special circumstances on the presence or absence of emotional support, but the same thing may be said of physical and financial support. The required analysis may tax the discretion of the court, but to say that it is difficult does not excuse the exercise. I therefore disagree with the majority opinion that evidence of emotional support or lack of it does not enter into the equation. Even if it did, however, the trial court did not rely on lack of emotional support alone to support the final decision.
Finally, the majority addresses “what seems to have most affected the trial judge— the fact that the father sought help from Legal Aid to assert his parental rights.” The opinion goes on to suggest at length that the trial court is castigating the father for being poor and for seeking free legal assistance. If this interpretation were correct, I could not disagree with the opinion. In my view, however, it is not a correct reading of the trial court’s order. What the trial court is attempting to convey in this part of the order is that instead, of lifting one finger to help the expectant mother, the father was interested only in asserting his own legal rights. He did not go to her or call her or write to her with the first offer of physical, emotional or financial support. His action at this juncture was, as it had been throughout the pregnancy, of not one thought, word, deed or dollar for the mother and child, but he would nonetheless claim his rights as the natural father. The trial court was expressing frustration with the contradiction in terms which the conduct of the father thus creates. It would appear that he was justified in doing so.
Of course the majority concludes that this ground, as interpreted by its opinion, is “legally insufficient for the court’s abandonment decision.” I suggest that the interpretation is incorrect and that the conclusion is therefore flawed.
In summary, the majority opinion characterizes the underpinnings of the order being reviewed as having three prongs, each of which is said to be legally insufficient to support a finding of abandonment. I interpret the trial court’s order differently and find, in sum, a legally sufficient basis for a finding of abandonment. In this court the father, as protagonist, has the burden to show there is no evidence to support the trial court’s finding of abandonment. As I interpret the record the father fails to carry that burden here.
Having concluded that the trial court has fallen into error the majority opinion, in reversing, also instructs the trial court to “set aside the mother’s consent, which was itself conditioned on the father’s consent being obtained.” It seems to me this is unwarranted at this stage, since no party has argued for or even requested that relief.
The majority opinion states that there was no basis for the trial court to appoint an attorney ad litem for the newborn child in these adoption proceedings. I tend to disagree.
Section 63.022(2)(Z), Florida Statutes (1993), provides:
(2)(Z) In all matters coming before the court pursuant to this act, the court shall enter such orders as it deems necessary and suitable to promote and protect the best interests of the person to be adopted.
As pointed out by the majority, a minor’s consent to his own adoption is not required unless the minor is more than twelve years of age. The minor himself therefore has no interest to protect as a party to the proceedings. Again, in Doe, the Florida Supreme Court holds that bonding, as an aspect of best interests of the child, is an appropriate issue only where the nonconsenting parent caused the delay which made the bonding between child and adoptive parents possible. That is not to say, however, that other interests of the child not related to the age of consent or bonding can never become an issue in a proceeding to establish abandonment. The raison d’etre for adoption is best *956 interests of the child and society. The legislature says “in all matters” related to an adoption the trial court may enter appropriate orders to promote and protect the best interests of the person to be adopted. What the legislature giveth, this court taketh away. I think we should not, and that is one of the reasons for my dissent.
Turning again to the consequences of what we do in this case, there are other considerations that have prompted my dissatisfaction with the result reached by the majority. One problem arises from an infirmity in the structure of the adoption process. By the stroke of a pen we have severed the relationship between baby girl E.A.W. and her adoptive parents, the only mother and father she has ever known and with whom she has lived for the first two years of her life. We do so to protect the “natural God-given legal right” of a birth parent “to enjoy the custody, fellowship and companionship of his offspring.” State ex rel Sparks v. Reeves, 97 So.2d 18 (Fla.1957). We do so in light of abundant precedent stressing the sanctity of biological parenthood. But, we do so here without any assurance that she will be returned to the loving arms of a parent. We more likely send her back to await a custody battle which may cause her to be placed in temporary foster care for another period of time, and ultimately, perhaps, to be offered for adoption again.
This is not mere speculation. The mother believes to this day that adoption is in the best interests of baby girl E.A.W. She consented to the adoption. She supported the position of the adoptive parents throughout the trial court proceedings and she continues to do so on appeal. Only if the adoption is reversed with custody reverting to the father does she seek to resume her parental role.
What of the father, then, and his quest for custody of baby girl E.A.W. As I interpret the majority opinion, his fitness as a parent is not an appropriate issue in the adoption proceedings, either at the trial court level or on appeal. That issue awaits consideration in subsequent custody proceedings. Whether appropriate or not, the record gives us a glimpse of testimony that has been and would presumably again be introduced on the issue of his fitness for custody. In due course, assuming it surfaces again in the custody hearing, that evidence will be tested for credibility and materiality. It is too late for this case, but there should be a mechanism to resolve the issue of parental fitness within the context of adoption proceedings when that issue is raised. And it should be raised. Otherwise we have, as here, a vicious circle.
One final observation. The proceedings below and activities ancillary to those proceedings were far from ideal. Nevertheless, I found nothing appalling in anything done by counsel except that they collectively, and I am sure unwittingly, allowed the proceedings to drag out for a year or more. I agree with the majority opinion that we should not criticize the trial judge for the excessive delays. There is nothing in this record that supports attributing those delays to him. Had he the wisdom of Solomon he might have correctly decided this case at the first hearing and ended it. But who is to say which result is correct. The future of a baby girl was at stake. There were areas of doubt. There were protagonists. He did his best in the face of all that. My dissent concludes that the final result was correct, which would mean that the delays did not unduly and adversely impact upon the life and future of baby girl E.A.W. As it turns out, the majority opinion goes the other way in this close case. For that reason, the delays loom ominously upon the relationships of the parties.
I respectfully dissent.